IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, SOUTHERN DIVISION

```
UNITED STATES OF AMERICA   )
                           )
     v.                    )   CRIMINAL ACTION NO.
                           )     1:13cr28-MHT
ALEJANDRO CRUZ-ROMERO      )         (WO)
```

OPINION AND ORDER

Defendants Alejandro Cruz-Romero and Blake Ronnie Enfinger are criminally charged with trafficking methamphetamine in violation of 18 U.S.C. § 2 (aiding and abetting) and 21 U.S.C. §§ 841(a)(1) (drug trafficking) and 846 (conspiracy). This case is currently before the court on Cruz-Romero's motion to suppress. Cruz-Romero asks the court to suppress evidence uncovered in his trailer in what he contends was an illegal warrantless search under the Fourth Amendment. An evidentiary hearing was held on the motion on July 18, 2013.[1] For the reasons that follow, the motion will be denied.

_____

1. The motion was originally referred to the magistrate judge for a report and recommendation. This court subsequently decided to hear the matter de novo.

## I. BACKGROUND

In early 2013, officers from the federal Drug
Enforcement Administration and the Alabama Beverage
Control Board set out to arrest two suspected drug
traffickers on whom they had been gathering intelligence
for some time, Enfinger and the person supplying his
methamphetamine, who they believed was named "Alex" and
was of Hispanic heritage.  An undercover officer and a
confidential informant drove to a Daleville, Alabama
Waffle House parking lot where they had previously
arranged to meet Enfinger to buy two ounces of
methamphetamine.  When Enfinger met the two there, he did
not yet have the promised drugs, so he set out in his
pickup truck to go get it.  As he did, undercover
officers trailed him.  The officers followed Enfinger as
he drove around the area and made several stops at gas
stations and other locations.  Although the officers lost
sight of him on several occasions, including one time
when he entered a Walmart, they generally succeeded in

2

tracking his movements over the course of the next few hours.

The officers eventually followed Enfinger to the Oak Terrace Trailer Park. The trailer park had two entrances off a state highway and consisted of about a dozen trailers in a loop, surrounded by woods on most sides. Because the park had such tight quarters, the officers decided not to follow Enfinger inside, but instead to drive around the outside and post themselves at places on the perimeter and try to watch his movements.

While Enfinger was in the park, one officer driving nearby saw a female walking on the side of the road. She appeared to the officer to be holding a cell phone. As he drove past her, she watched him and periodically looked down to what the officer thought was her phone. Based on her movements, she appeared to be sending a text message. The officer's vehicle was not marked as belonging to law enforcement, but he was wearing a ballistic vest bearing the word "POLICE," which he

thought she may have seen.  His "gut feeling," from past experience with how drug dealers work, was that she was a paid "lookout" (somebody who watches for law enforcement during criminal activity) for "Alex," Enfinger's methamphetamine supplier, who was most likely in that trailer park, and she was using her phone to alert "Alex" to the officer's presence.  The officer reasoned that, the woman appeared to be Hispanic and, according to his intelligence, "Alex" was also Hispanic, and that, he thought, supported his suspicion that they were involved in a criminal conspiracy together.  He also found it suspicious how she watched him while using her phone, and that she was standing on that particular road, which was in a generally rural area.

The officer radioed a request for others to go check her out.  He also turned around to check her out himself. When the officers approached her, it was clear that a language barrier precluded meaningful communication.  She no longer seemed to have her phone, or whatever it was

that the officer thought was a phone, and she could not explain why that was in a language the officers understood. They suspected that she had thrown the phone into a deep ravine beside the road, but none of them made any attempt to enter the ravine to search for it. Instead, the officers gave up on her in short order and returned to pursuing Enfinger.

Around this same time, an officer watched Enfinger park his truck in the trailer park, get out, walk towards a trailer, and turn around its corner, apparently walking towards the trailer's entrance. Although the line of sight between the officer and Enfinger was lost when Enfinger turned the trailer's corner, it seemed apparent to the officer which trailer's entrance he was proceeding towards. The officer informed the others of this over the radio. Some time later, Enfinger exited the trailer, got back into his truck, and drove out of the park, onto the state highway. Some officers continued to trail him while others stayed behind.

5

Minutes later, Enfinger was back at the Waffle House parking lot where the undercover officer and the confidential informant were waiting for him, and he delivered them the promised methamphetamine.  He then left the parking lot and drove onto the highway.  After about two miles, two marked sheriff's department cars turned on their blue lights.  Instead of stopping immediately, Enfinger made a very brief attempted escape, steering abruptly off the roadway and accelerating across the median.  He stopped almost immediately, however, before running his car into a steep drainage ditch.  He then gave up the attempted flight and succumbed to arrest.  Asked where he had gotten the methamphetamine, he answered, "Alejandro," who, he said, was back at the trailer park.

The arresting officers called their cohorts back at the park to inform them of Enfinger's arrest and statements.  Having learned that Enfinger had implicated "Alejandro," the officers immediately approached the

6

trailer they believed Enfinger had entered, knocked several times, and, there being no answer, took the door by force.[2]  About a dozen officers stormed inside and found Cruz-Romero as he was either in or getting out of the shower.  They allowed him to put on a pair of pants, but, before they did, they searched the pockets.  There, they found several thousand dollars, which they believed was the money Enfinger used to buy the methamphetamine. The cash was seized and Cruz-Romero was arrested.

The officers did not have a warrant for the search.

_____

2.  There was some conflicting testimony about the time that elapsed between when Enfinger left the trailer park and when the officers entered Cruz-Romero's trailer. One officer testified that the intervening period was no more than a few minutes.  If that statement was correct, however, that would not be enough time for Enfinger to deliver the methamphetamine, get arrested, and implicate "Alejandro," which another testifying officer contends all occurred before entry into the trailer.  Based on the evidence presented to the court, it seems most likely that the officer had simply not remembered accurately the length of time between when Enfinger left the trailer and when the officers entered, thinking it was shorter than it actually was.

## II. DISCUSSION

Cruz-Romero asks this court to suppress at trial the cash and any other evidence that was found during the warrantless search of his trailer, which he contends was an illegal search under the Fourth Amendment.[3]

### A.

The Fourth Amendment protects "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.  A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." United

_____

    3.  Not long after Cruz-Romero was arrested during the warrantless search, the officers obtained a warrant to reenter and search the trailer further.  Cruz-Romero does not seek to suppress any evidence uncovered in that search.

States v. Rush, 248 F. Supp. 2d 1121, 1123 (M.D. Ala. 2003) (Thompson, J.) (punctuation and citations omitted).

"Probable cause," the first requirement for a warrantless search, "exists where the facts lead a reasonably cautious person to believe that the search will uncover evidence of a crime." United States v. Burgos, 720 F.2d 1520, 1525 (11th Cir. 1983) (quotation marks and citation omitted). Here, the circumstances leading up to the entry into the trailer, including, most importantly, the arrest of Enfinger and his implicating Cruz-Romero (that is, "Alejandro"), were sufficient for reasonable law-enforcement officers to believe that evidence of drug trafficking could be found in the trailer. Cruz-Romero challenges this conclusion because, given that the officers lost sight of Enfinger on several occasions, they did not, in fact, actually know for sure whether Enfinger had purchased the drugs inside the trailer rather than, perhaps, another trailer, or somewhere else around town where Enfinger had stopped.

9

But that argument is without merit: <u>Probable</u> cause requires only a probability, not a certainty, <u>e.g.</u>, <u>Dahl v. Holley</u>, 312 F.3d 1228, 1234 (11th Cir. 2002) ("Nor does probable cause require certainty on the part of the police. Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment.") (punctuation and citation omitted), and there was certainly a high probability that Enfinger purchased the drugs in the trailer, like he said he did, rather than, say, at the Walmart.

As for "exigent circumstances," the second requirement for a warrantless search, that term "refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." <u>Burgos</u>, 720 F.2d at 1526. For example, exigent circumstances are often found where delay could reasonably result in the endangerment of the public or law-enforcement officers or the destruction of evidence of crime. <u>See</u> <u>id</u>. at 1525-26. "The need to

invoke the exigent circumstances exception to the warrant requirement is particularly compelling in narcotics cases because narcotics can be so easily and quickly destroyed." Rush, 248 F. Supp. 2d at 1123 (punctuation and citation omitted). The legal test for exigent circumstances is "whether the facts would lead a reasonable, experienced agent to believe that [an exigency was present].... Thus, the court is not looking at whether the officers possibly could have secured a warrant before they entered [the] property, but whether it was reasonable for the officers to believe that [the warrantless entry was necessary]." Id. at 1123-24 (citations omitted; emphasis in original).

Here, the evidence is sufficient to support that reasonable officers could have believed that warrantless entry was necessary. For one, there were several opportunities for Cruz-Romero to have discovered that the officers were outside his trailer: although the officers did not know for sure that the woman they encountered was

11

an actual lookout for Cruz-Romero, the disappearance of her phone (or at least what appeared to be her phone) gave sufficient cause to suspect her involvement; if not her, somebody else in the trailer park's tight quarters could have seen and alerted Cruz-Romero to the officers circling outside; and, although Enfinger's attempted flight was brief, to say the least, there was the reasonable possibility that he could have used his cell phone to alert Cruz-Romero of his arrest during that short time.  The events unfolding that day were "tense, uncertain, and rapidly evolving," Graham v. Connor, 490 U.S. 386, 396-97 (1989), and given the limited information available to the officers, they had reasonable cause to fear that Cruz-Romero knew of their presence.

Second, as the officers had sufficient reason to fear that Cruz-Romero knew they were outside and that a large drug transaction had just occurred inside, the decision to enter the trailer without a warrant was reasonable.

If they did not, Cruz-Romero could have destroyed evidence or, like his apparent compatriot Enfinger, attempted to flee, which could have endangered the officers or the public at large, for example, if there was a chase on a public road.  Again, that the officers did not know for certain that either of these would actually occur is besides the point; the Fourth Amendment allows law enforcement to respond to reasonable probabilities as well as certainties.  See United States v. Bradley, 644 F.3d 1213, 1262 (11th Cir. 2011) ("An exigency exists if the facts would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.") (punctuation and citation omitted; emphasis in original).

In sum, the circumstances were such that reasonable law-enforcement officers had cause to fear that Cruz-Romero was aware that they were outside and that, knowing as much, he might seek to destroy evidence or flee.  In

13

short, there was sufficient exigency to enter his trailer without a warrant.


### B.

Cruz-Romero makes two arguments for why, even accepting the foregoing, the search should be held unlawful under the Fourth Amendment.


### 1.

First, Cruz-Romero argues that, even if there were exigent circumstances in this case, the Fourth Amendment's exigent-circumstances exception should not apply here because the officers themselves created the exigency by following Enfinger to the trailer park. But, that argument is foreclosed by Kentucky v. King, 131 S.Ct. 1849 (2011), which held that the "police-created exigency" rule applies only where officers "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment," id. at 1858, and

here, the officers' conduct in following Enfinger to the trailer park was entirely lawful.  Cf. id. at 1862 ("When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.").

### 2.

Cruz-Romero's second argument requires more attention: the decision to search his trailer was, he contends, infected with a bias against persons with Hispanic heritage or identity.  At the evidentiary hearing on this motion, the government challenged that allegation and argued that, "This is not someone who was targeted for being Hispanic.  It's someone who was targeted for being a methamphetamine dealer."  Second Hr'g Tr. (Doc. No. 88) at 141:25-142:2.  Indeed, it seems clear from the evidence that Cruz-Romero was not pursued because of his perceived Hispanic heritage, but rather

because there was evidence linking him to drug trafficking.

But, of course, even if a defendant is not targeted for prosecution because of his ethnic heritage or identity, but is rather targeted because of real, credible indications of criminal activity, invidious discrimination could still infect any number of the decisions governmental actors make in the course of a criminal investigation and prosecution. Here, the court has grave concerns that that may have occurred. That is because, while there seems to be no rational reason anybody's perceived ethnicity needed to be introduced into this suppression motion litigation, it was, twice. C.f. United States v. Montero-Camargo, 208 F.3d 1122, 1134 (9th Cir. 2000) (en banc) ("Relying on the principle that our Constitution is color-blind, and neither knows nor tolerates classes among citizens, the Supreme Court has repeatedly held that reliance on racial or ethnic criteria must necessarily receive a most searching

16

examination to make sure that it does not conflict with constitutional guarantees.") (punctuation and citations omitted).

The first instance of ethnicity being injected into this case was when, at the hearing, the officer was asked, when he made the decision to enter Cruz-Romero's trailer forcefully without a warrant, "What was your biggest concern, that [Cruz-Romero] was going to flee or destroy evidence?" First Hr'g Tr. (Doc. No. 40) at 134:21-22. The officer answered: "Boy, that's hard to say. Probably flee. I knew who he was, what kind of drug dealer he was. I knew that he was Hispanic, and I have had experience of them fleeing...." Id. at 134:23-25. He later clarified that, when he said he had experience of "them fleeing," the "them" referred to "Hispanics," not "drug dealers." Second Hr'g Tr. (Doc. No. 88) at 100:2-9. He further explained that, in the course of his career, he had faced difficulty extraditing criminal suspects who had fled to Mexico, so given that

17

he understood himself to be pursuing a Hispanic methamphetamine dealer who he had reason to believe was connected to Mexican drug traffickers, he wanted to avoid that possibility.

Indeed, law-enforcement officers sworn to enforce the Nation's criminal laws have a legitimate interest in "bringing [law violators] to justice," id. at 105:16-18, and, for legitimate concerns about international extradition, nationality may be a valid consideration as officers execute their duties.  However, the court is troubled by the possibility that when the decision was made to enter Cruz-Romero's trailer forcefully without a warrant, the actual motive may not have been just legitimate extradition-related considerations, but also invidious ethnic prejudice.  For one, the officer's testimony throughout the hearing focused on the belief that Cruz-Romero was "Hispanic," not that he was a national of Mexico.  For example, when the officer was asked whether the fugitives sought by the DEA office

18

where he was stationed have "any characteristics that are in common," he answered, "Yes, sir.  They're all Hispanic males."  Id. at 102:11-16.  It goes without saying, of course, that "Hispanic" is not synonymous with "Mexican national": not all Hispanics are Mexican nationals, and many are, in fact citizens of the United States and the State of Alabama.  Cf. Cent. Ala. Fair Hous. Ctr. v. Magee, 835 F. Supp. 2d 1165, 1191-93 (M.D. Ala. 2011) (Thompson, J.) (fact that legislators used "illegal immigrant" and "Latino" or "Hispanic" interchangeably suggested that statute was intended to target the latter as well as the former), vacated as moot, 2013 WL 2372302 (11th Cir. May 17, 2013).  The officer could, of course, have explained his motive as being based on Cruz-Romero's nationality, but he instead focused on Cruz-Romero's ethnicity, and the court cannot be blind to that.  And, second, in considering the import of the "fleeing Hispanics" testimony, the statements should be considered

alongside the second instance of ethnicity being injected
into this litigation.

That second instance was with respect to the
"Hispanic" woman the officer suspected was a lookout.
The government's legal brief in this case made much of
the argument that, because the woman was Hispanic and the
criminal target (who ended up being Cruz-Romero) was also
Hispanic, that was good reason to suspect that the two
were coconspirators.  In the brief's recitation of
relevant circumstances, this contention was listed first:
"This woman was Hispanic, and [the officer] had received
information that Enfinger's source of supply was himself
Hispanic."  Govt.'s Br. (Doc. No. 37) at 8.  Only after
that did the brief go on to assert as other relevant
circumstances that the woman was "glancing furtively
back-and-forth at [the officer] and the phone," that the
phone later "mysteriously disappeared," and that "All of
these facts give rise to the reasonable belief ... that
this woman was connected with the stash house, and had

just tipped off the occupants to [the officer's]
presence." Id. Likewise, the officer's testimony at the
hearing specifically identified the suspicious person he
encountered as a "Hispanic female." First Hr'g Tr. (Doc.
No. 40) at 66:8-12. Later, the officer downplayed the
perceived Hispanic heritage, at one point stating that
that fact did not play any role in his suspicion, see
Second Hr'g Tr. (Doc. No. 88) at 60:17-19, and at another
point that, it "may have just entered [his] mind a little
bit" and it "may have" made it "more likely" that she had
"some kind of relationship with the person that Mr.
Enfinger was dealing with." Id. at 81:6-12. The
government prosecutor also walked back the argument,
stating that "this woman on the side of the road" was
"such a small part of the analysis for these officers,
and it's turned into a much bigger issue, for whatever
reason. But that's not the heart of this." Second Hr'g
Tr. (Doc. No. 88) at 136:15-22.

Here, it seems apparent that the woman's watching the officer "furtively" (in the government's words) while appearing to send text messages was itself reasonable cause for some concern, at least enough concern to warrant inquiry, as happened here. And once that inquiry revealed that the woman's phone "mysteriously" disappeared, there was obvious reason to suspect something awry. Given that, why then did the officer feel the need to inform the court that the suspicious person he encountered near the drug deal was not just any suspicious person, but a "Hispanic" person, and why was "she's Hispanic, he's Hispanic" asserted as a central factor supporting the reasonableness of the warrantless search in this case? It seems apparent that introduction of the woman's perceived ethnicity was completely unnecessary. The court recognizes that specifying a person's ethnicity in passing is ordinary in conversation and, in particular, in identification, and, by itself, does not necessarily indicate much. But, here, the

suspicion of the "Hispanic female" cannot be considered by itself, but must be considered alongside the "fleeing Hispanics" testimony.  Taken together, these unnecessary injections of the "Hispanic" factor into this case would seem to imply there may be an unstated belief beneath the surface: that it is reasonable to be wary of Hispanic people because they are Hispanic.  <u>Compare</u> <u>Calhoun v. United States</u>, 133 S.Ct. 1136, 1136 (2013) (statement of Sotomayor, J.) (quoting prosecutor who asked at trial, "You've got African-Americans, you've got Hispanics, you've got a bag full of money.  Does that tell you--a light bulb doesn't go off in your head and say, This is a drug deal?").

In short, even if Cruz-Romero was, as the prosecutor put it, "not someone who was targeted for being Hispanic" but "was targeted for being a methamphetamine dealer," Second Hr'g Tr. (Doc. No. 88) at 141:25-142:2, the court has grave concerns that Cruz-Romero may have had his trailer forcefully entered and searched without a warrant

not just because he was a methamphetamine dealer, but because he was Hispanic. And if that is correct, it is intolerable. Disparate treatment of criminal suspects on account of their perceived ethnicity "diminishes the dignity of our criminal justice system and undermines respect for the rule of law." <u>Calhoun</u>, 133 S.Ct. at 1138. If the police are perceived to treat criminal suspects of certain ethnic identities worse than others, that "breed[s] resentment and alienation among minorities.... People who see the criminal justice system as fundamentally unfair will be less likely to cooperate with police, to testify as witnesses, to serve on juries, and to convict guilty defendants when they do serve. In addition, people who have lost respect for the law's legitimacy are more likely to break the law themselves.... Finally, the perception and reality of a fundamentally unfair criminal justice system contribute to broader racial divisions in society." <u>Martinez v.</u>

<u>Village of Mt. Prospect</u>, 92 F. Supp. 2d 780, 782 (N.D. Ill. 2000) (Castillo, J.) (citation omitted).

Now, the question is, if the warrantless nature of the search were motivated by ethnic prejudice, whether the evidence seized during that search should be suppressed under the Fourth Amendment. Under binding Supreme Court precedent, the answer is no: "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. The officer's subjective motivation is irrelevant." <u>Brigham City v. Stuart</u>, 547 U.S. 398, 404 (2006) (punctuation and citations omitted); <u>see also</u> <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."); <u>Draper v. Reynolds</u>, 369 F.3d 1270, 1275 (11th Cir. 2004) (affording a sheriff qualified immunity against Fourth Amendment claim alleging racial profiling because

"ulterior motives will not invalidate police conduct based on probable cause to believe a violation of the law occurred"); Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1166-71 (10th Cir. 2003) (holding that the plaintiff did not have a Fourth Amendment claim even though there was evidence of racial profiling); Giron v. City of Alexander, 693 F. Supp. 2d 904, 944 (E.D. Ark. 2010) (Eisele, J.) (declining to attach legal significance under the Fourth Amendment to an officer's racist intent).

Here, for the reasons already explained, the circumstances leading up to the search of Cruz-Romero's trailer, that is, circumstances aside from his or anybody else's ethnicity, justified the lack of a warrant. Therefore, the court will deny Cruz-Romero's motion to suppress, though the court remains gravely concerned by the possible indications of prejudice beneath the surface in this case.

***

Accordingly, it is ORDERED that the motion to suppress (Doc. No. 33) filed by defendant Alejandro Cruz-Romero is denied.

DONE, this the 5th day of August, 2013.

　　　　　　　　　　　　　　　/s/ Myron H. Thompson
　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE